FILED

2008 Mar-25  AM 11:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**JASPER DIVISION**

| | |
|---|---|
| **JANICE D. COLE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 06-CV-0084-KOB** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Janice D. Cole ("Claimant") brings this action pursuant to Section 205(g) of the

Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final, adverse decision of

the Commissioner of the Social Security Administration denying Claimant's application for

Social Security benefits.  Based on the court's review of the record and the parties' briefs, the

court will REVERSE and REMAND the Commissioner's decision.

**I.  STANDARD OF REVIEW**

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person cannot

> engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can
> be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than 12 months.

To make this determination, the Commissioner employs a five-step, sequential evaluation

process:

(1)  Is the person presently employed?

(2)  Is the person's impairment severe?

(3)  Does the person's impairment meet or equal one of the specific impairments as set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

(4)  Is the person unable to perform his or her former occupation?

(5)  Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520, 416.920.

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*"  Walker*, 826 F.2d at 999.  The Commissioner's factual determinations, however, are not reviewed *de novo*, but are affirmed if supported by substantial evidence.  "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings."  *Walker*, 826 F.2d at 999.  A reviewing court must not look only to those parts of the record that support the ALJ's decision, but the court must also view the record in its

entirety and take account of evidence that detracts from the evidence relied on by the ALJ.
*Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## II.  BACKGROUND[1]

Ms. Cole applied for Disability Insurance Benefits on May 21, 2001, claiming a disability
onset date of April 19, 2001.  (R. 69-72; 649).  She alleged that she could perform no substantial
gainful activity because of a number of impairments, including pain in her back, left shoulder,
left arm, and left hand; carpal tunnel syndrome; borderline intelligence; hypertension; migraine
headaches; and anxiety/depression.  (R. 109-114, 115-121, 130-133, 143-154, 649).  She had a
twelfth grade education and past relevant work as a production operator (automotive
manufacturer).  (R. 505).

The Disability Determination Service initially found her "disabled," but the Quality
Assurance Unit reviewed the decision and recommended subsequent denial.  (R. 505-08).  A
hearing was held on September 17, 2003, and her claim denied on April 24, 2004.  Ms. Cole was
then forty-two years old.  The Appeals Council denied Claimant's request for review on
November 15, 2005 (R. 6), and the ALJ's decision became the final decision of the
Commissioner.  An appeal to this court followed.

Ms. Cole's tale of woe began when she was just thirty-seven years old.  On July 26, 1999,
Ms. Cole visited her family physician, Dr. Garry Magouirk, with complaints of pain in her right
shoulder after an on-the-job injury.  At the time, Ms. Cole, who is five feet, three inches tall,
weighed 207 pounds.  Dr. Magouirk diagnosed right shoulder strain with pain and prescribed

---

[1] Ms. Cole's medical records amount to more than 430 pages of the record.  This court cannot
possibly list every diagnosis and doctors' examination.  Rather, the court has endeavored to
summarize and enumerate enough of the relevant findings to demonstrate the Commissioner's
decision in denying Ms. Cole disability benefits was not supported by substantial evidence.

several medications.  When the pain had not subsided by August 9, 1999, Dr. Magouirk refilled

one of the prescriptions and referred Ms. Cole to an orthopedic specialist.  (R. 189-91).

On September 9, 1999, Dr. William Sudduth, an orthopedic surgeon, examined Ms. Cole.

Dr. Sudduth observed that lateral rotation led to right trapezius discomfort, and, although Ms.

Cole had full range of motion, mild impingement did exist on the right side.  Dr. Sudduth

injected the right subacromial space with Celestone and Marcaine and prescribed Celebrex and

exercises.  (R. 195).  One month later, Dr. Sudduth continued the Celebrex prescription and

exercises.  (R. 193).

The next visit reflected in the medical records is a May 15, 2000 visit to Dr. Leslie

Fowler, an orthopedics and sports medicine specialist.  Dr. Fowler's records indicate that Ms.

Cole was once again complaining of shoulder pain.  Dr. Fowler's impression was rotator cuff

tendonitis, for which she prescribed anti-inflammatory medications and exercises.  (R. 248).  Ms.

Cole returned on June 13, 2000, at which time Dr. Fowler concluded that her exam was "more

compatible with cervical radiculopathy with pain more in the trapezius region radiating down

into her triceps as opposed to around the rotator cuff."  (R. 247).  X-rays and an MRI were

normal.  When Ms. Cole had not improved by August 30, 2000, Dr. Fowler referred her to a pain

clinic.  (R. 244).

On September 15, 2000, Dr. Wesley Spruill examined Ms. Cole at the pain clinic.  Ms.

Cole reported neck and right shoulder pain, particularly in the right suprascapular trapezius area.

After examination, Dr. Spruill's impression was "[m]yofascial pain syndrome, secondary to

repetitive motion."  (R. 216).  He recommended a change in her job position (which required

repetitive motion), prescribed Celebrex and Robaxin, and ordered physical therapy.  (R. 216).

On September 27, 2000, Dr. Spruill identified three distinct trigger points in the right trapezius

muscle and injected methylprednisone and marcaine.  (R. 214).  The pain had not improved by

October 4, 2000; Dr. Spruill again ordered that Ms. Cole cease repetitive motion and continue

therapy and medications.  (R. 211).  Ms. Cole returned to Dr. Spruill on October 18, 2000, again

with little or no improvement.  (R. 209-10).  Ms. Cole still reported pain when Dr. Spruill saw

her again on November 3, 2000.  In addition to the shoulder and neck pain, Ms. Cole was also

experiencing low back pain, which Dr. Spruill attributed to the myelogram injection.  (R. 204).

Nerve conduction studies performed during this time were within normal limits (R. 209); a CT

scan and cervical myelography showed "[n]o significant abnormality" of Ms. Cole's spine.  (R.

207).  At no time did Dr. Spruill doubt or alter his initial diagnosis of myofascial pain syndrome.

On November 14, 2000, Ms. Cole returned to Dr. Fowler.  She complained primarily of

continuing lower back pain since her myelogram.  In fact, she had visited the emergency room

two days earlier and received pain medications for the problem.  At her appointment with Dr.

Fowler, Ms. Cole "ha[d] difficulty in being able to tell" whether her shoulder had improved

because of the severity of her lower back pain.  Dr. Fowler's impression on November 14, 2000

was "[p]ossible radiculitis."  He prescribed a Medrol Dose Pak.  (R. 240).  When Ms. Cole

returned a week later, she again complained of neck pain radiating into her shoulder and lower

back pain.  Dr. Fowler ordered a neurosurgical evaluation.  (R. 239).  A neurosurgeon, Dr.

McKenzie, did not find any abnormalities of "documented surgical pathology," but

recommended continued conservative care and pain management.

Subsequently, on November 27, 2000, Dr. Fowler ordered a functional capacities

examination to determine if Ms. Cole could return to work "in some form or fashion."  (R. 237).

The functional capacity evaluation results showed a consistency indicator of 75.8%.  Because

only tests with indicators at 81% or higher suggest consistent effort, the tester concluded that Ms.

Cole "self limited all activities due to increased low back pain."  He suggested that the results not be utilized to objectively determine Ms. Cole's functional status.  Nonetheless, the tester noted that, according to the test results, Ms. Coles functional capacities meet guidelines for the light physical demand level.  On January 16, 2001, opining that he was "unable to recommend any objective findings on exam," Dr. Fowler released Ms. Cole for return to work.  (R. 236).  Dr. Fowler reiterated this opinion on Ms. Cole's subsequent visits on February 21, 2001 and March 13, 2001.  (R. 233, 234).

On March 27, 2001, Ms. Cole was examined by Dr. Arturo J. Otero, a neurologist.  (R. 298-319).  A spinal MRI during that time showed slight reversal of the normal cervical lordosis, mild right-side arthritis.  Ms. Cole's spine was otherwise considered normal.  A concurrent MRI of Ms. Cole's right shoulder showed marked thickening and increased signal in the supraspinatus tendon, consistent with severe tendonitis.  The radiologist also saw a "distinct linear high signal abnormality" consistent with a complete tear, as well as fluid in the subacromion and subdeltoid bursa and glenohumeral joint.  (R. 315-16).  The results of an electrophsyiologic test were interpreted as normal.

On April 17, 2001, at the request of Dr. Otero, Ms. Cole saw Dr. Donald S. Scott, an orthopedic surgeon, for evaluation of her right shoulder.  Based on his examination and Dr. Otero's radiographs, Dr. Scott noted degenerative joint disease in the shoulder with AC joint arthritis and evidence of tendinosis about the rotator cuff.  He injected Ms. Cole's right shoulder with Kenalog and Marcaine, and prescribed Ultram and Celebrex.  (R. 477).  On May 4, 2001, Dr. Scott performed a surgical repair of Ms. Cole's right rotator cuff tear and decompression of a "fairly compressed" nerve.  (R. 271).  She was doing well a few weeks later.  (R. 469).  Dr. Scott prescribed physical therapy, in which Ms. Cole participated for several months, although she did

complain of radiating neck pain and numbness on several occasions.  In addition, the physical therapist noted on several dates that Ms. Cole was "not getting much better."  (R. 250-58, 280-93).   At a June 7, 2001 appointment, Dr. Scott observed that Ms. Cole's musculoskeletal system was within normal limits, but she complained of neck pain and numbness into her right hand. Dr. Scott referred Ms. Cole back to Dr. Otero.  (R. 467).

On Ms. Cole's subsequent visit to Dr. Otero on July 2, 2001, Dr. Otero "suspected" chronic lumbosacral myofascial syndrome and noted probable supraspinatus tendon tear/rotator cuff syndrome.  (R. 306).  He prescribed Lortab, Lotrel, Ambien, and Arthrotec and referred Ms. Cole to the pain clinic.  On December 13, 2001, Dr. Otero noted that Ms. Cole had a "definite dysfunction . . . above the elbow," and prescribed a therapeutic trial of Neurontin.  (R. 302).  On January 30, 2002, Dr. Otero noted positive Tinel's signs just above Ms. Cole's right elbow and smaller shoulder musculature on the right.  He opined that Ms. Cole's medical status exceeded the scope of his practice and reiterated that she see a chronic pain management specialist and orthopedic surgeon.  (R. 299-300).

In the meantime, Ms. Cole had also seen Dr. Janice L. Hudson, a family physician, on May 2, 2001.  Dr. Hudson's findings included poorly controlled hypertension, dense fibrositis, rotator cuff injury, and chronic back pain.  (R. 339-41).  Dr. Hudson saw her periodically through March 19, 2002, with little change in Ms. Cole's symptoms.  Dr. Hudson's August 12, 2001 notes indicated that Ms. Cole was taking the following medications:  Augmentin, Ambien, Arthrotec, Lotrel, Pamelor, Flexeril, Lortab, and Orthocept.  (R. 336).

On July 26, 2001, Ms. Cole returned to Dr. Scott at Dr. Hudson's request.  Ms. Cole complained of muscle spasms and tingling in her hand and neck.  Dr. Scott reviewed an EMG ordered by Dr. Otero, which indicated mild median nerve compression.  All of Dr. Scott's

physical observations on July 26, 2001 were normal, other than trapezial spasms and his
diagnosis of mild carpal tunnel syndrome in Ms. Cole's right wrist.  He provided Ms. Cole a
removable splint and prescribed Skelaxin.  (R. 465).  Dr. Scott continued to see her periodically
through April 22, 2002, with no change in his observations and treatment.  He continuously
advised her to keep appointments with pain specialists and to continue therapy.  (R. 445-63).

On October 3 and 4, 2001, Ms. Cole underwent a pain clinic evaluation by Dr. Eugene A.
Mangieri, a pain management specialist.  Dr. Mangieri noted "pain on right head rotation with
radiation into the shoulder area and into the posterior cervical region limiting full rotation by at
least 80%" and "positive nerve root compression . . . right-ward into the shoulder area."  (R.
431).  Dr. Mangieri's diagnosis was "[o]ccupational injury related cervical disk disruption and/or
cervical myo-ligamentous injury with severe radicular pain."  (R. 432).  He opined that the
radicular pain was of unclear etiology.  (R. 433).  He also noted that Ms. Cole was clinically
depressed and suffered from hypertension, morbid obesity, and carpal tunnel syndrome.  (R.
433).

Dr. Mangieri performed a cervical epidural steroid injection via catheter and started Ms.
Cole on Neurontin and Methadone.  (R. 422).  On October 10, 2001, nerve conduction studies
were completed.  The results showed "evidence of old/chronic L5 radiculopathy without
evidence of acute denervation."  (R. 425).  A subsequent nerve conduction study on November 6,
2001 was interpreted as normal.  On December 10, 2001, Dr. Mangieri noted that Ms. Cole
reported some improvement, although pain management remained suboptimal overall.  He
performed caudal epidural therapeutic injections on December 10 and 19, 2001 and on January 7,
2002.  (R. 401-03, 407-08, 412-14).  Dr. Mangieri prescribed Duragesic patches during this time.

On December 27, 2001, Ms. Cole underwent a psychological consultative evaluation by Raj J. Phoha, Ph.D., a neuro/clinical psychologist.  Dr. Phoha noted some cognitive processing difficulty, perhaps a side effect of Ms. Cole's pain medication.  Dr. Phoha's report indicated that Ms. Cole's hobbies included shopping, listening to music, watching television, spending time with her boyfriend, visiting family, and reading newspapers, magazines, and books.  Ms. Cole indicated that she did laundry, cooked, managed her finances, and attended church about once a month.[2]  Dr. Phoha indicated "cognitive disorder NOS [*i.e.*, not otherwise specified]" and estimated Ms. Cole's Global Assessment of Functioning ("GAF") at 70  (R. 294-97).

After his third caudal injection in January 2002, Dr. Mangieri continued to see Ms. Cole through June 2002.   During this time, Ms. Cole repeatedly notified Dr. Mangieri that she was unable to manage pain.  Dr. Mangieri prescribed Lasix and MS Contin.  In March 2002, Dr. Mangieri referred Ms. Cole to another orthopedic surgeon, Dr. H. Chester Boston.  Dr. Boston's examination indicated a cervical strain, and an MRI of the cervical spine showed mild bony degenerative changes without evidence of disk herniation or neural impingement.  Dr. Boston concluded that Ms. Cole had "no problems with her spine" and did not need follow-up care including pain management.  He suggested that over-the-counter medications, exercise, and resumption of a "normal lifestyle" would be enough.  (R. 450).

On May 14, 2002, Dr. Mangieri completed forms for the Commissioner.  He indicated that Ms. Cole's prognosis was poor and that she was not a malingerer.  He opined that Ms. Cole could sit continuously for only fifteen minutes; could stand continuously for up to ten minutes; could stand/sit for only two hours of an eight-hour day; required shifting positions and

---

[2] Ms. Cole testified at the hearing that she frequently requires assistance with many of these activities.  (R. 657-58).

unscheduled breaks of ten to fifteen minutes every twenty to thirty minutes throughout the day; must use an assistive device for standing and walking; could "never" lift "less than 10 lbs."; and had significant limitations in repetitive reaching, handling, and fingering. (R. 380-82). Dr. Mangieri concluded:

> Pathological pain syndromes cause sever limitations and . . . emotional as well as neuroendocrine stress. More often there are few or no anatomic abnormalities to explain the pain. The diagnosis of pathological pain is the primary disease resulting from neuroanatomic & physiology changes in the spinal cord and brain based on & referred to as: "neuroplastic." These changes evolve as a consequence of sustained poorly controlled pain or nociceptive impulses promoting long-term depression and facilitation of perpetual pain processes. Pain imaging can be performed to demonstrate these changes. This is expensive and available in research labs.

(R. 383).

On May 24, 2002, Dr. Scott performed a right carpal tunnel release surgery with tenosynovectomy. (R. 364). The surgery went well, and Ms. Cole had no complaints regarding her wrist on follow-up visits. She subsequently began physical therapy. (R. 443, 587).

On August 1, 2002, at the instruction of her attorney, Ms. Cole underwent psychological testing by John R. Goff, Ph.D. Dr. Goff administered multiple tests to assess Ms. Cole's impairments: Wechsler Adult Intelligence Scale (WAIS-III), the Reitan-Indiana Aphasia Screening Test, informal clock drawing tasks, the Minnesota Multiphasic Personality Inventory (MMPI-2), and the Millon Behavioral Health Inventory (MBHI). The WAIS-III results indicated a verbal IQ of 66, a performance IQ of 70, and a full scale IQ of 65. Dr. Goff noted inconsistent performance on the WAIS-III and contrast with earlier scores; he suspected that Ms. Cole's scores were negatively affected by her distraction associated with pain, her medications, and her

psychiatric condition.  "Nontheless," Dr. Golf concluded "she does have cognitive deficits."  Dr. Goff noted consistent responses on the remaining tests.  (R. 478-85).

Dr. Goff concluded that Ms. Cole had a histrionic personality orientation, functioned in the mildly retarded range, and experienced chronic and persistent pain.  Dr. Goff's diagnostic impression included pain disorder with both pyschological and physical features; adjustment disorder with depressed mood; borderline intellectual functioning; and reading disorder.  Dr. Goff did not believe that Ms. Cole's profile was "suggestive of conversion symptomatology."  Dr. Goff concluded that Ms. Cole's conditions represented a moderately severe to severe impairment.  (R. 478-85).

Dr. Goff completed a "Medical Source Statement (Mental)" assessing the degree of Ms. Cole's impairments in a number of work-related categories, using rating terms of "none," "mild," "moderate," "marked," and "extreme."  He rated her as having "marked" to "extreme" impairments in fourteen of eighteen areas.  The source opinion indicated extreme constriction of interests; restriction of daily activities; ability to understand, remember and carry out complex instructions; ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek; and ability to perform at a consistent pace.  He concluded the source statement by opining that Ms. Cole's impairments can be expected to continue twelve months or longer.  (R. 486-88).

The ALJ determined that Claimant met the first two steps of the sequential evaluation process, but concluded that, although she has "severe" impairments, she did not suffer from a listed impairment.  The ALJ then found that Claimant's allegations regarding her functional limitations, including pain, were not totally credible.  He focused on alleged "consistent . . . inconsistency – of effort, and of complaints compared with objective findings."  (R. 33).  He

-11-

stated that "at least four physicians . . . have considered the claimant's complaints inconsistent with the severity of impairments."[3]  Thus, the ALJ concluded:

> [C]onsidering the relative lack of objective evidence that the claimant has impairments reasonably expected to result in the level of pain and limitation she alleges, the response to treatment including surgery, nerve blocks and medication, and the inconsistencies noted by physicians and therapists, the undersigned must conclude that the objective evidence does not confirm either the severity of the claimant's alleged symptoms arising from the diagnosed conditions, or that those conditions could reasonably be expected to give rise to the symptoms alleged by the claimant.

(R. 38-39).

The ALJ expressly discredited Dr. Goff's opinions because he determined that they were inconsistent with other medical evidence and with Ms. Cole's "ability to write checks, pay bills and monitor her finances, her daily habit of reading books, magazines and the newspaper, and her ability to care for other family members."  (R. 42).  The ALJ did not expressly reject or discredit Dr. Mangieri's opinions, but seems to have implicitly rejected those portions unfavorable to his decision[4].  The ALJ took testimony from a vocational expert, who testified, in response to the ALJ's hypothetical <u>not</u> incorporating the opinions of Dr. Goff and Dr. Mangieri, that Ms. Cole could perform certain sedentary jobs such as cashier, telephone operator, dispatcher, or solicitor, and light jobs such as a teacher's aide.  (R. 675-76).  The ALJ then asked the vocational expert to assume the first hypothetical <u>plus</u> Dr. Goff's assessment.  The vocational expert replied then that such a person would be unable to function in any work setting.  (R. 677).  The ALJ next asked the vocational expert to assume the first hypothetical <u>plus</u> Dr. Mangieri's assessment.  The

---

[3] The court saw no such conclusions in the doctors' reports; as discussed below, no doctor reported that he or she doubted Ms. Cole's complaints of pain or believed her to be a malingerer.

[4] He accepted Dr. Mangieri's diagnosis of migraines.

vocational expert testified that such a person would be unable to function in any kind of full time work.  (R. 677).

According to the ALJ, Ms. Cole's complaints of pain were "not credible or consistent with the medical evidence . . . [or] her daily activities," which included shopping, watching television, walking, cooking, doing laundry, spending time with her boyfriend, attending church, and riding in a car.  The ALJ found the Claimant "has the residual functional capacity to perform a significant range of light work" (R. 45), and, therefore, could perform a significant number of jobs such as teacher's aide, cashier, and telephone operator.  (R. 46).  Accordingly, the ALJ concluded that Ms. Cole was not disabled.

### III.  ISSUES

On appeal to this court, the Claimant raises three broad issues:

(1)    Whether the ALJ erred by ignoring or discrediting the medical opinions of Dr. Mangieri, a treating physician, and Dr. Goff, an examining neuropsychologist, both of whom concluded that Claimant suffers from disabling pain.

(2)    Whether the ALJ erred by failing to find that Claimant's morbid obesity, functional illiteracy, and pain disorder were severe impairments.

(3)    Whether the ALJ erred by failing to consider the effect of migraines and depression in assessing Claimant's residual functional capacity.

The questions of whether the ALJ should have credited the opinions of Drs. Mangieri and Goff and whether he should have considered the effects of Claimant's pain disorder are inextricably intertwined; thus, the court will consider them together.  Because the court concludes that the ALJ's rejection of those opinions and Claimant's allegations of disabling pain was not supported by substantial evidence, thereby requiring reversal, the court need not consider Claimaint's remaining arguments.

-13-

## IV.  DISCUSSION

Courts in this circuit must apply a three-part standard in evaluating claims of disabling pain or other subjective symptoms.  This standard requires:  (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition, or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  Although this standard requires objective medical evidence of a condition that could reasonably cause the alleged symptoms, objective proof of pain itself, or of its intensity, is unnecessary.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  "Subjective pain testimony which is supported by clinical evidence of a condition that can reasonably be expected to produce the symptoms  of which claimant complains is itself sufficient to sustain a finding of disability."  *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  If an ALJ discredits a claimant's testimony of pain, he must do so expressly and articulate explicit and adequate reasons for doing so; substantial evidence must support the ALJ's articulated reasons.  *Hale*, 831 F.2d at 1011-12.

In this case, the ALJ discredited Ms. Cole's complaints of pain for four reasons:  (1) lack of objective evidence; (2) response to treatment; (3) inconsistencies noted by physicians and therapists; and (4) Ms. Cole's description of her daily activities.  The record, however, belies the ALJ's reliance on each of these grounds.

Ms. Cole's allegations in the present case are well supported by objective medical evidence.  Almost every doctor to examine Ms. Cole documented medical conditions related to rotator cuff injuries, carpal tunnel syndrome, and/or compressed nerves in those areas.  Each of these conditions reasonably could be expected to result in pain.  That pain may have been

-14-

exacerbated by the pain syndrome diagnosed by two other physicians and "suspected" by a third. Specifically, Dr. Mangieri -- the pain specialist -- diagnosed Ms. Cole with a pain syndrome. Similarly, Dr. Goff's carefully complete testing led to his diagnoses of pain disorder, adjustment disorder with depressed mood, borderline intellectual functioning, and reading disorder. Although Ms. Cole's cognitive functioning results were higher in the past, the majority of Dr. Goff's test results were not contradicted in the record.  Interestingly, in reversing Ms. Cole's initial favorable determination, the Quality Assurance Unit included "myofascial pain syndrome" as a "documented impairment" (R. 508), yet the ALJ, examining the same evidence, did not list it as an impairment.[5]

In addition, a longitudinal history of complaints and attempts at relief supports Ms. Cole's allegations.  *See* SSR 96-7p, 1996 WL 374186, at *7 ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow treatment once it is prescribed lends support to an individual's allegations of intense or persistent pain . . . .").  Beginning in July 1999, Ms. Cole received prescription pain medication and injections of pain medications.  According to the administrative record, over the subsequent three years and two months, Ms. Cole received the following medications and treatments for her pain:  Soma; Wygesic; Arthrotec; Celestone; Marcaine; Celebrex; Robaxin; Promethezine HCL; Skelaxin; Trendar; Ultram; Flexeril; Lortab; Neurontin; Methadone; Duragesic patches; MS Contin; Axert; Zanaflex; Avinza; at least three caudal epidural injections; and three cervical epidural injections.  She also performed certain exercises,

---

[5] Ms. Cole's failure to obtain the "quite expensive" pain imaging that Dr. Mangieri indicated would show neuroanatomic causes of Ms. Cole's pain does not negate her disability claim.  *See, e.g., Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988), *citing Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) ("To a poor person, a medicine he cannot afford to buy does not exist.").

either as directed or as part of physical therapy.  During that time, she was referred to at least two orthopedic specialists and to pain specialists on no less than three occasions.  Nothing provided Ms. Cole relief from her pain.  Her pain specialist believed her complaints of pain were genuine and opined that the pain is disabling.

The ALJ expressly rejected Dr. Goff's opinions and, although he did not explicitly assign weight to Dr. Mangieri's opinions, implicitly rejected his opinions, including both doctors' diagnoses of pain syndromes or disorders, by concluding that "there is no evidence that the claimant has such a level of pain and limitations as she alleges."  (R.38).  The ALJ based this conclusion on the failure of several doctors to find conditions more severe than compressed nerves, rotator cuff injuries, and carpal tunnel syndrome.  The opinions of Drs. Mangieri and Goff, however, are not contradicted by any medical evidence in the record.  That other doctors – who were neither pain specialists nor neuropsychologists – did not reach the same diagnosis and specific conclusions is not enough to contradict these opinions.  *See* 20 C.F.R. § 404.1527(d)(5) (stating that more weight is generally given "to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist").  The ALJ failed to follow the standards for evaluating opinion evidence when rejecting the opinions of Drs. Mangieri and Goff.  *See King v. Barnhart*, 320 F. Supp. 2d 1227, 1231-33 (N.D. Ala. 2004) (reversing this ALJ for failure to properly consider Dr. Goff's conclusions).

Here, Ms. Cole's pain syndrome itself is a contributing factor to her pain, and Dr. Goff's and Dr. Mangieri's diagnoses of a pain syndrome do not conflict with any other doctor's opinion.  What the ALJ failed to recognize was that the other doctors' observations of rotator cuff injuries, carpal tunnel syndrome, and compressed nerves support that Ms. Cole would experience pain, and Dr. Goff's and Dr. Mangieri's diagnoses explain the severity of such pain (even though

-16-

objective evidence of the <u>severity</u> need not be shown). Accordingly, the pain standard is met in this case; the combined effect of Ms. Cole's physical, mental, and emotional problems establishes a disabling condition.

The "inconsistencies" upon which the ALJ partially based his decision include some indications that Ms. Cole put forth inconsistent effort on certain tests, such as the WAIS-III. In noting such inconsistencies, however, the ALJ failed to demonstrate that they affected the doctors' opinions regarding Ms. Cole's disabling pain. For instance, even accounting for this inconsistency, Dr. Goff concluded that Ms. Cole had cognitive difficulties. Moreover, Dr. Goff attributed the apparently depressed and inconsistent scores to Ms. Cole's discomfort and pain. Similarly, the "consistency indicator" on Dr. Fowler's physical capacity evaluation was slightly lower than the minimum required to suggest consistent effort. Like Dr. Goff, however, Dr. Fowler suspected that Ms. Cole's efforts were inconsistent <u>because of</u> her pain. The ALJ failed to discuss, and nothing in the record suggests, that these two instances of "inconsistent" effort affected the validity of Dr. Goff's and Dr. Mangieri's conclusions that Ms. Cole suffers from debilitating chronic pain. In fact, the opposite is apparent in the record: Ms. Cole's pain contributed to the inconsistencies.

The ALJ's reliance on Ms. Cole's daily activities to discredit her complaints of disabling pain is likewise unsupported by substantial evidence. The case of *Horton v. Barnhart*, 469 F. Supp. 2d 1041 (N.D. Ala. 2006), presents a very similar situation to the current case. There, the claimant testified that she experienced constant lower back pain that radiated down her right leg; a vocational expert testified that pain to the extent described by plaintiff would prevent any type of work. *Horton*, 469 F. Supp. 2d at 1045. The same ALJ reached the same conclusion that he did in the current case: that the claimant had satisfied the first part of the Eleventh Circuit's pain

standard, but failed to meet the second prong because "the medical evidence did not support the

plaintiff's allegations of limitation of function or pain to the degree that it would preclude all

substantial gainful activity." *Id.* To reach this conclusion, the ALJ rejected the opinion of Dr.

Goff – the same clinical neuropsychologist who examined Ms. Cole.

        In *Horton*, Judge Guin reversed and remanded the ALJ's decision because his rejection of

Dr. Goff's opinion was unsupported by substantial evidence.  In much the same way that he did

in this case, the ALJ, in *Horton*, found that Dr. Goff's assessment was "inconsistent with the

claimaint's daily activities and with the objective clinical findings of the claimant's treating

sources." *Horton*, 469 F. Supp. 2d at 1045.  Judge Guin, however, pointed out that the record

contained no competing mental evaluation; Dr. Goff's assessment of the claimant's mental state

and functional limitations was not inconsistent with the claimant's treating physicians' treatment

of claimant's physical needs related to pain. *Id.* at 1046.

        Judge Guin also rejected the ALJ's reliance on the claimant's daily activities.  The ALJ

concluded that the claimant's pain testimony was inconsistent with her daily activities, which

included driving, shopping, attending church, performing some household chores, reading for

pleasure, watching television, independently caring for personal needs, having friends, and

walking for exercise. *Horton*, 469 F. Supp. 2d at 1046.  Judge Guin rejected such a rationale,

relying on the Eleventh Circuit's recognition that "'participation in everyday activities of short

duration, such as housework or fishing,' does not disqualify a claimant from disability."

*Id.* (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997)).

        This court likewise finds that the ALJ's reliance on many of these same activities –

shopping, listening to music, watching television, cooking, attending church, and maintaining a

boyfriend – does not support summarily discrediting Ms. Cole's claims of disabling pain.

-18-

"[S]tatutory disability does not mean that a claimant must be a quadriplegic or an amputee. Similarly shopping for necessities of life is not a negation of disability and even two sporadic occurrences such as hunting might indicate merely that the claimant was partially functional on two days. *Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity . . . .*" *Id.* (quoting *Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981)) (emphasis by Judge Guin). In addition, the ALJ ignored Ms. Cole's testimony that she frequently requires assistance in these activities.

In any case, the relevant issue is not Ms. Cole's ability to occasionally shop, attend church, or engage in any number of fulfilling activities but instead her ability to engage in gainful employment – *i.e.*, to work. *See Horton*, 469 F. Supp. 2d at 1047. The ALJ's reasons for rejecting Ms. Cole's allegations of pain and the opinions of Drs. Mangieri and Goff are inadequate and unsupported by substantial evidence. Thus, Ms. Cole's testimony and the opinions of Drs. Mangieri and Goff must be accepted as true. *See Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (citing *Hale*, 831 F.2d at 1011); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Abundant objective evidence establishes the credibility of Ms. Cole's pain, and no doctor has doubted her credibility or contradicted the opinions of Drs. Mangieri and Goff. The vocational expert testified that either doctor's opinion alone, if credited, would preclude Ms. Cole from working at any job (R. 674-77). The Commissioner, therefore, failed to carry his burden at step five of showing that Ms. Cole could perform other work. Accordingly, Ms. Cole is disabled within the meaning of the Social Security Act, and the court will reverse the Commissioner's decision and will remand the case with instructions that Ms. Cole be awarded the benefits claimed.

Although the court concludes that substantial evidence does not support the ALJ's failure to credit the opinions of Dr. Mangieri and Dr. Goff, the ALJ also committed an alternative reversible error: he failed to specify the weight given to Dr. Mangieri's opinion and his reasons for apparently discreditng it. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) ("The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."). The ALJ's failure to properly refute Dr. Mangieri's opinion means that, as a matter of law, he accepted it as true. *Id.* If Dr. Mangieri's opinion is true, then the vocational expert's testimony alone establishes that Ms. Cole is disabled, and therefore entitled to benefits.

### V. Conclusion

For the reasons stated above, Ms. Cole is disabled within the meaning of the Social Security Act. Considering the evidence as a whole, the court concludes that substantial evidence does not support the ALJ's rejection of Dr. Goff's and Dr. Mangieri's opinion and his ultimate conclusion that Ms. Cole is not disabled; substantial evidence of disability exists as described above. The court, therefore, will REVERSE the Commissioner's final decision, and will REMAND the case with instructions for the Commissioner to award Claimant the benefits claimed. The court will enter a separate order consistent with this memorandum opinion.

DATED this 25th day of March, 2008.

*Karon O. Bowdre*

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE